Meders v. Warden. We'll hear from Mr. Valensky. Thank you, Your Honor. May it please the Court, the only way that Meders could have prevailed at trial was to put the gun that he owned in the hands of Bill Arnold to create a reasonable doubt about who used the gun to shoot the Jiffy Store clerk. To do this, Mr. Davis, the trial lawyer, had to challenge the credibility of Arnold, Creel, and Harris, yet inexplicably Davis failed to use materially inconsistent recorded prior statements, particularly as those statements related to possession of the gun in question. Can I ask you a quick question about that? Because in your brief, you say, I think it's in your reply brief, maybe at page 7, you say, as to the possession of the gun immediately before the crime, and that was a key fact, you say that the incidents reported about the truck shootings would have provided decisive support. That was your word. Is that right? Decisive? I mean, I get it that it supports your position on balance, but is it decisive? It is because Creel and Arnold denied that the truck shootings happened. So it not only supports Meders' testimony that the trucks were shot, but it also directly refutes Creel and Arnold and Detective Jack Boyett, who testified that there was no evidence to support Meders' claim of the truck shootings, only Meders' say so. So it's a threefer, if you would, Your Honor. I thought you said in your brief that it put the gun in their hands. I'm sorry, go ahead. But not at the time of the shooting. And in fact, the Bowen truck shooting was two hours before they arrived at the store. And the other shooting, which I guess was Brown's truck, was an hour to an hour and a half before, was it not? It creates a series of three events each an hour apart. The first being the Bowen truck shooting, the second being the Brown truck shooting, and the third being the Jiffy store. An hour later. But weren't they going bar hopping during that time? Is there anything in the record about what, for example, between the Brown truck shooting and the robbery murder? Where were they? I believe that the they were driving on the Highway 17 area, which is where the Jiffy store was located in that part of the Brunswick area. I believe their bar hopping happened both while Jimmy Meders was passed out on his couch and immediately after they picked him up at his home. So they rode around for an hour and didn't stop anywhere, according to the evidence in the record? It's not clear from the record. Let me ask you this. If Meders had nothing to do with the shooting, as he testified and was surprised when it happened, why didn't he tell the law enforcement officer that followed him to his yard with a traffic violation that that had happened? I believe it's fair to say that Meders just experienced an incredibly shocking event where he was physically present as it happened. The fact that people don't immediately disclose things to police can be explained by a number of things, but you're right that it's a factor that the jury should have considered. When the officer asked him specifically about that, he denied even being to the store. The jury could consider that, did he not? Not at the stop at 3 in the morning. No, no. The next morning. Yes. It was all morning. I apologize. Later that morning, Meders was taken to the police station and questioned by police officers, and he denied any knowledge of the shooting. He said he hadn't been to the store. His testimony, you're right, his testimony was that he did that on the instruction of Randy Harris, who told him that morning when they met about 10 o'clock not to say anything about the shooting. Now, admittedly, that was a silly, stupid, damning response, but here's the point, Your Honor. John Johnson, the prosecutor in this case, fully explored Meders' failure to make that disclosure. By contrast, Davis never impeached Harris, even though Harris did the same thing at 11 o'clock with Jack Boyett. I understand that, but Harris wasn't there. Harris wasn't, I'm sorry. I'm sorry. Harris wasn't there. Harris wasn't there at the murder, the robbery murder. Harris said he hadn't seen Creel Arnold and Meders since 6 p.m. I understand that, but also, I'm just trying to look at it from the jury's perspective. Yes, sir. Also, you have Harris at least telling what he allegedly knew, questioned whether it was accurate or not, soon thereafter, but you've got Meders waits 13 months by my count. Kept his mouth shut. Yes, sir. Until right before trial, and the jury could infer, could they not, that he was waiting to hear what the others had to say and their final story was and to shape his story around it. Well, first, Your Honor, it was six months before trial that he was interviewed by Boyett in jail, but your point is well taken, and I think it's important. But it was 12 to 13 months after the shooting. Yes, you're right about that. And he called Boyett, did he not? He called. He asked Boyett to come talk to him. He did. So, he waited a year and then said, this is my story. He did, but the point is the jury knew that and was able to weigh that in terms of judging Meders' credibility because I agree with you that we must look at this from the jury's in fact calculation of their credibility. And whereas Johnson brought out the delay, Johnson brought out the nondisclosures that you referenced, Davis did none of that, although it existed with Harris, Creel, and Arnold, and Davis didn't use any of the pretrial I'm past performance deficiency, except I tend to agree with I believe it was a habeas, a federal habeas court who said food stamps would have come in. So, failure to object to food stamps is not performance deficiency. But I understand Davis didn't do any of this. What I'm doing is taking all of your evidence that you developed in the remand hearing and adding it to the evidence that was presented at trial and trying to decide whether there's a reasonable probability of a different result had it all been mixed up and put in front of the jury. Yes, there are things that their brief doesn't discuss that look like you need to have an opportunity to answer. I'm trying to give you an opportunity to answer what I'm talking about. It doesn't seem to make sense to me if Arnold is committing the crime and putting himself in jeopardy of lethal injection, well actually 87, it was electric chair, putting himself in line for that to get money. That he doesn't take any money, Meadors does. And I know Meadors says oh he told me to do it, but if I'm on that jury I'm saying no wait a minute he goes in there, Arnold goes in there to commit the crime to get money and then he doesn't take money Meadors does. That, I mean you're arguing to the jury that that's not important, that's not relevant that's not incriminating, that's not decisive. Tell me what your argument is. My argument is that it's not I'm not suggesting that's not relevant. That is a relevant concern. The problem with it is that your questions are suggestive that the three men who were there and about which there's no distinguishing physical evidence in this case. The three men who were there acted in a normal fashion after killing the clerk for what turned out to be 30 odd dollars after having spent 12 to 15 hours drinking and taking drugs. So it's clear from the testimony that they fled from the scene together in essence freaking out is I think their description. They get to the shady acres trailer park and then they split up and it's as much an oversight that Meadors doesn't give money to them as that it was intentional. There is no proof one way or the other. I thought Meadors testified somewhere along, well it had to be, it had to be, I'm sorry, it had to be somewhere along the line that he offered the money or tried to give the money to Arnold and Arnold wouldn't take it. Am I wrong about that? There was testimony to that effect in the car as they were at shady acres trading, driving of the car. Arnold had been driving. Meadors took over the driving and went home from there. So I don't disagree that that is a factor. But whether Meadors and Arnold should have split the money, didn't think to split the money or intentionally did not, that doesn't answer the question of who had Meadors' gun and pulled the trigger. The difficulty, I guess this gets back to my first question, is I'm just not sure that there is, no pun remotely intended, sort of smoking gun evidence about who had the gun immediately before the crime and if not, I mean it seems to me given the standard that you're having to contend with here, you need something that is pretty well decisive and I'm just not sure that the impeachment with the inconsistent stories even plus the truck incident reports really puts the gun in anyone else's hand immediately before the murder. I tend to agree with you that this was a credibility case. There wasn't physical evidence. There's not a video or photos. There aren't fingerprints. What this case was about was credibility. Arnold says Meadors, Meadors says Arnold. And that's where the adversarial process broke down to the point where we all know now that there were these material inconsistent statements to the point where John Johnson falsely told the jury on closing that his witnesses had told the same story since day one. That's a quote from his closing. Have they stuck with their story? Have they told the same thing? If you look at Randy Harris, Bill Arnold, Greg Creel, the police officers all told the same story all the way down the line from day one. Help me counsel with Harris. I'm sorry? Help me with the other witness Harris. As I understand it just help me understand the record here. Harris testifies at the trial that the defendant came up to him in his motel room and said to him in substance that the defendant, quote, blew the man's head off for $38. Yes. Earlier pre-trial he says that the defendant confessed to killing someone for $38 but did not know which part of the body was shot, right? That's one difference. One impeachment, yes. He asked the officers Was there an earlier point even before that when Okay, tell me about that. So the confession supposedly happens at 3 in the morning after the shooting occurs. When Harris is first contacted by Boyette at his shop at 10 or 10.30 in the morning Harris says I haven't seen those guys since 6pm the night before. Totally taking out the confession scenario totally taking out the fact that he spent the morning with Creel and Arnold helping them get their story straight. So there are two stages to So the first account was I know nothing about it The second account was he confessed to killing him for $38. I just don't know where he was shot. And then at trial it changed. I knew he blew his head off because that's what he told me. Right. And along with the confession he says that Medders dumped his bullets on the bed and there were two spent shells The police knew about that statement within seven, eight hours of the bullets being dumped. Yet they are never found. And now, now we know the two truck shootings happened. Tell me about the record There should have been four spent. Unless two truck shooting shells were discarded earlier. No, he had the six spent I understand your point. I'm sorry, go ahead Judge Mark With respect to the drive-by truck shootings, one involves Bowens, the second one involves Brown Neither Bowens nor Brown, if I have this right, are able to identify the shooter They don't see the shot that hit the truck and bounced off the truck, caused the ding in the truck or anything like that Mrs. Bowens saw the vehicle and described it. The mother of two The conclusion goes to the shooter. Right Neither, no one is able to tell us extrinsically who the shooter was. It's all a credibility contest on whether the shootings even happened. That's where we started Okay, so I want to go back to the question that Chief Judge Karnes asked you at the beginning Yes, sir. The period of time that the truck shootings took place in relationship to when the homicide occurs in the Jiffy stores, how long? It's about two hours Bowen, hour break, Brown hour break. So what we know is that there were two shootings There's some evidence that one of the others had a motive other than Meders, but we don't know who did the shooting and we know that they did bar hopping during that period of time. I think Tell me if I have that wrong. It's around there, yes And what we know is the motive for the shooting of the trucks points to Creel and Arnold and has nothing to do with Meders. This all came out at the remand hearing, which is the relevant post-conviction hearing in this case So Meders doesn't know Keith Bowen Meders did not know the Browns Creel and Arnold had just had a fight with Keith Bowen while Meders was passed out and Brown had been in what I would characterize as a feud with Creel's family. His in-laws are called the Brockingtons So feuding ongoing with them. At a later point, we learned there were pending charges involving altercations but that wasn't introduced at the remand hearing. The tough thing for me, and I don't mean to sound like a to the position you're articulating, but you still need something that fairly clearly puts the gun in someone else's hands immediately before the murder, right? Sort of granting everything you just said, what we have is fairly compelling evidence that Arnold and or Creel had a motive to be handling the gun an hour to two hours before the murder, right? I guess I just wonder if on the basis of that we can sort of get to the standard that no reasonable jurist could have concluded anything other than that this would have made a difference So in considering the prejudice of whether there's a probability of a different outcome, a failure to make the adversarial system work, I don't believe it's our burden to prove decisively that matters, that Arnold had the gun in his hands. I guess maybe I've used that word, I don't mean to load that word with too much significance. All I mean to say is that given the habeas standard that you have to overcome, it seems to me that the evidence needs to be, to use a technical legal term of art, pretty doggone compelling or something, right? I mean it's got to be needle moving. It has to be needle moving and I think you have to consider that respectfully in the context of the trial that happened. So not in some artificial circumstance. We had a jury, if I can just finish the point real quickly, we had a jury who sent out six questions one of which related to the truck. I'm going to give you every opportunity to answer the questions I have about your case just like I'm going to give Ms. Graham an opportunity. Here's a problem I have with your case and help me with it. They go in there, Arnold, Krill, and Meadors. According to Meador's own testimony, he and Arnold are up front near the cashier, cash register. Krill goes to the back, he's in a microwave getting a biscuit or whatever, and suddenly and without warning is the way Meador's put it, the store clerk is shot to death. Krill didn't know it was going to happen. Just like Meador says he didn't know it was going to happen. It was sudden, unexpected. Krill had nothing to do with it. It's undisputed he had nothing to do with it. Nobody's ever testified that he shot the store clerk. No, it's Arnold Lewis. Okay. So why does Krill commit perjury and put him in line for all kinds of problems and say that it was Meador's instead of Arnold? One is because Krill has a relationship with Arnold, which is they're long time friends and Krill met Meador's that day. So he lies to cover up a capital murder and put him in line for perjury and all other kinds of problems. Well, because he knows the guy? Well, if you look at the impeaching statements, Your Honor, he also lied about knowing there was a gun. He doesn't want to involve himself in the crime, but he doesn't have to lie not to be the trigger man and not to be guilty of murder. But as between Meador's who he doesn't know and Arnold who he does know and who he spent the morning plotting their response with. Remember, Meador's goes his own way after Shady Acres. Arnold and Krill go to a trailer and immediately call Harris and then they spend five hours together working up their story. Well, speaking of Harris, let me ask you about this. I didn't see anything in all the orders or the briefs about this and I looked. Harris initially denies knowing anything about this and then an hour later, I believe, one of the briefs says he tells the officer the alleged statement of Meador's that he had killed a man for $38. How does Harris know it was $38? There are a couple of sources for that, Your Honor. The first I think is that there was discussion of the money, as I think you pointed out earlier, when they stop at Shady Acres before the three men split up. So Krill and Arnold could have had knowledge. I'm sorry, discussion. I didn't know that. I didn't say it because I don't know it, but I may have implied it. But he was trying to get Arnold. He said he was trying to get Arnold to take the money. Meador's testified to that. But what evidence is there that Harris was told how much money there was? The only evidence is inferential. No, not really. I mean, you got Harris' testimony that Meador's told him. That's not inferential, except it's the third version. But putting that aside, Arnold and Krill spent five hours together before anyone went to the police. And we know from Meador's testimony that Harris told Meador's to keep quiet. So it's clear that Harris and Meador's were together at 10 in the morning, 10.30 in the morning. And therefore, Meador's told Harris? Could have. It's not clear. He could have testified to that. He didn't. There wasn't a focus at the trial on how Harris knew the $38, in part because no one was asking about that. I agree with you that it's a notch against Meador's. It was actually between $31 and $38 is what the store manager concluded. Whether he said $31 or $38, he hit it within the range. Within the guideline range, we might say. I get your point. But the problem is that all of these factors that you and Judge Newsom are pointing out are all the factors that Johnson directly pinned on Meador's. And there wasn't any pushback with the evidence that could have made this a credibility contest as it should have been with a skeptical jury. But what we have to do is project that it was a credibility contest and see if there's a reasonable probability of a different result. Yes, sir. And so I think of this in terms of getting away with misleading the jury. I think of this in terms of this trial judge twice instructed the jury on falsus in uno. If a witness is impeached, you can disregard the entirety of that witness's testimony because Davis did not impeach the witnesses. That instruction only applied to Meador's and Meador's lost the ability to have the jury disregard the witness's testimony from Creel, Harris, and Arnold. I think that the case law I have a minute left. The case law I think that's relevant to this is Smith v. Wainwright, 799 Fed Second, 1442 from the circuit. I think by analogy, Weary v. Cain, which is a Brady case but the materiality standard in Brady is the same as the prejudice standard in IAC. I think Rompila and Wiggin and Sears are also relevant to this, particularly as to the requirement that the probing analysis reweighing the evidence after the fact when you know everything requires a careful weighing of that which existed versus a reweighing under Terry Williams' case. I think those are the relevant cases and we come back to the key point that reasonable doubt about who possessed Meador's gun and shot the clerk was the whole strategy here. That was the defense and failing to deal with the truck shootings Right. The question here though is we're not debating whether counsel's performance was deficient. What we're debating is whether or not looking through the prism of a DEPA whether the state Supreme Court could reasonably draw the conclusion it did or put conversely no reasonable court could have found what they found. That's a tall order so you have to go through the burden of Strickland superimposed on top of which is the lens of a DEPA. You can just answer me if you. I think if you look at the Tooton and found persuasive by the Georgia Supreme Court they did not do a reweighing. They misapplied the established Strickland and Williams standard because they considered the evidence to be so prejudicial so overwhelming and in part. Let me ask the question differently. Could a reasonable court find no prejudice or on this record did you have to find prejudice. I think you do your honor. OK. Let me count on your time and we're not in your reply time and we'll give you full five minutes but I'm flagged a couple well more than a couple questions if you could just give me if you remember from the record I couldn't find it in anything I looked at and I didn't have the jury instructions. What exactly did the court instruct the jury in answer to question number five. You say the trial court advised the jury accordingly but what did it say. You can't consider anything that hasn't been presented to you or were in essence you have to rely on the evidence that's been presented. OK. So he didn't tell him they didn't tell him there was no evidence there had been a shooting. There was nothing. He didn't tell them there hadn't been a shooting is what I'm getting. Oh no he did not. He said nothing in the record rely on the record basically. All right. Let me ask you this. What exactly does the record show about the first search by the officers other than the fact there were a bunch of them and they searched the record shows who the officers were when the search happened and that it didn't result in the finding of the murder weapon. The officers were Brunswick police and GBI. There's not a specific what I would call blow by blow. Nobody asked him what I was getting at. Nobody asked him during the trial remand hearing anything else. Did you look under the waterbed. No. OK. Is is there mercifully I've never had a waterbed but is there anything in the record to indicate where the gun was. No. Just under the waterbed. OK. You know those those things sit on the frame I guess. No they sit on the floor with the frame around them because they're too heavy. I said it was merciful. And let me ask you I've got probably more than you wanted to know. A couple more here. You've answered a number of these and I appreciate that. Now as I understand it from the two truck shootings Arnold had at least the theory was that Arnold had the gun both times. Yes. OK. So Creel didn't have the gun. No. OK. I'm still puzzled about Creel and his role in this thing. And let me tell you something else and this is not arguing with you. I'm just giving you an opportunity to respond to it. I think a jury could very easily find there was a whole lot of lying going on by everybody in this thing. Even the defendant's wife was shown to have lied about where they were before and she didn't go out of the house so forth all that. Here's my question and there's a standard jury. Well that's an argument and it's often an instruction about you can consider the reasons or the motive someone has for not telling the truth and way their interest in that. All right. You've got matters who has you couldn't have a stronger interest than avoiding at that time the electric chair. You've got Arnold same interest. You've got Creel much lesser interest or incentive to lie. And then you've got Harris with a lesser incentive to lie. So the two people with the less incentive to lie say that matters was the responsible party. Oh I'm sorry that is a request for an argument as opposed to a historical fact. I understand. I think it's fair to say that your your characterization of the fact that there may have been a lot of misstatements going on here creates an opportunity for a malice murder. All three of them Creel Arnold and matters in this mix. And if Creel admits knowledge of the gun if Creel admits anything that comes close to an understanding that this robbery could happen he's right in the middle of a malice murder charge. So it's not as if because you have the three of them out there shooting around this gun. Arnold goes in with the gun. It would not be unusual for someone in Creel's position to say I knew the gun was there in Arnold's pocket and the murder happens. He's he's taken the position that he has to disown any knowledge of the gun and he does that from his prior statements to the trial testimony. And I think that's the shortcoming with respect to Arnold. I think with Harris it's clear that I meant that is respect to Creel. I think with Harris I think it's clear that Arnold's his first cousin. He was the first call that Arnold made and he coordinated this prosecution. Historical fact question again The state says on 39 of the red brief there was no evidence presented to the remand court that Medders was receiving food stamps. You said something in your prior in your reply brief without a citation of the record that he was receiving food stamps. Oh I'm sorry. There's a police report dated October 14th where officer Burt Medlin interviewed Mrs. Medders and recorded Mrs. Medler's Medders as informing the police that she was a recipient of food stamps because of their child. So she was in the whatever that program is WIC program I think it was at the time. Is that trial a remand or where is that testimony? I'm sorry where is that police report? The police report is in the prosecutor's file. The prosecutor's file was D1 in the remand hearing. We can I think we when I stand up again I think I'll have a page site for you. October 14 Burt Medlin questioning Sherry Medders. Thank you. You will have your full five on reply. Thank you. Ms. Graham. Please the court. My name is Sabrina Graham and I'm here on behalf of the respondent. I'd like to take an opportunity here to address some of the factual disputes regarding the food stamps Mr. Walensky was correct in the remand hearing in the exhibits there is a statement by Sherry Medders that they were receiving food stamps. However, there was no evidence presented to the remand court that the Medders were receiving food stamps and the citation in petitioner's brief in their reply brief actually cites to the habeas courts order which is not part of the record before this court because it's not obviously part of the remand court record and that particular court order cites to Mr. Boyette's testimony which was from the state habeas court where he says he thought they were receiving food stamps but there was no actual evidence that they were receiving food stamps. There are a couple other factual questions that you asked regarding the Bowen and the Brown shootings. The Bowen shooting we know occurred at 1230 in the morning. However, we do not know what time the Brown shooting occurred unless I have completely misread this record several times. At the remand hearing Robert Brown and Andrea Brown testified that they found the bullet the next day and that was around 130 or actually I think Andrea found it with her neighbor but they did not know what time the shooting occurred. So the testimony would be from Mr. Medders as to when that occurred. What do we know about bar hopping during that two hour period of time from the record? I agree with opposing counsel. I do not think the record is clear. Does it say anything about that? Mr. Creel and Mr. Arnold state that they went bar hopping in their pretrial statements and they state it at trial but they don't give a specific time as to when the bar hopping happened in regard to the shooting because of course they denied the truck shootings. Can I ask you just a question about the truck shooting? One I think of the more disturbing things to me in this case is Boyette's testimony where he was asked at trial did you have any reason to think that these guys might have been involved in the truck shooting and he says nothing other than the fact that Medders told them. Then you've got the police reports that he knew about I think I understand that he had put them in the file. Was that truthful testimony that he gave? I think it was truthful testimony when you look at the actual question that he was asked Mr. Davis asked him and you stated that, and I'm inserting Arnold and Creel, denied shooting at a truck. Mr. Boyette, yes sir. And did you have any reason to doubt that they were telling the truth? The only thing that I had to indicate that they did this is Jimmy Medders saying they did it, doing the actual shooting. So you have no other reason. He said there is no other evidence to indicate that they did that. None? I mean really? I mean the police report on the second of the two, right? The person at least implied that they thought Creel had been up to it. But he had no actual evidence that Mr. Arnold did the shooting. That anyone else did the shooting. That's how I read the question, the way it was posed to Mr. Boyette. Do you have any evidence that they did the actual shooting? That it wasn't for example Medders that did the shooting. And that's what I think, that was possibly how Mr. Boyette or Detective Boyette understood that particular question. I will just tell you that the combination of that testimony and the prosecutor's closing where he says, unlike their people, my guys have told the same story all the way down the line, is troubling. I understand that. The combination of those two things is pretty troubling because whether, it's not that that itself demonstrates prejudice, but it plugs into the theory of prejudice in the case. That the failure to impeach the credibility of the witnesses and the failure to bring about this corroborating evidence might have been needle shifting. I would say that a fair amount of jurors could say that it was not needle shifting. In the case of the prosecutor, certainly Arnold and Creel's statements regarding what happened between approximately 8.30, 9 o'clock at night and 12.30 in the morning could have been impeached. But their testimony and their pretrial statements regarding the crime were the same. Right, but the statement was broader than that, wasn't it? The prosecutor's statement in closing argument if I have it right, in words or substance was essentially the same story had been told by all three of our witnesses from day one. Is that not what he said? Yes, Judge Marks, I am not disputing that. But we know unambiguously that the same story was not told by all three defendants from day one, right? Not only do we know that as an abstract matter, we know that Harris gives three accounts. First account, I don't know nothing. Second account, he confessed that he was shot, he shot him for $38, but he didn't know where. Third account, he shot him with 38 bucks and blew his head out. So we know that Harris' account changes, there may be powerful reasons to explain why, but he goes from I know nothing to I know the defendant told me how he shot him and how much money he made off with. And then we have substantially different accounts vis-a-vis Arnold and Creel about matters that you may argue are extrinsic to the homicide, but are certainly basic to the lead up to the homicide. Circumstances of what happened within two hours of the homicide. And yet we have the prosecutor unambiguously and sweepingly telling this jury they said the same thing from day one. What in response did defense counsel say? Or did he not answer that? To that particular point? Yes. I'm talking about now closing argument. Did that come up in the initial closing argument by the prosecutor or was that in rebuttal? I mean the statement of the prosecutor, their story remained the same from day one. I do believe that Mr. Davis gave his closing argument first and then the prosecutor gave his argument last. And there wasn't. So there was never an opportunity to. And I don't know what the rules at that time were about closing arguments, but I'm pretty sure Mr. Davis said first. And obviously Mr. Davis. So there were only two closing arguments. Correct. At the guilt phase. The defendant went first, the prosecutor went second and that was it. Yes. Even though the prosecutor bore the burden. Yes, that's how I remember the record. And just to piggyback a bit, I mean, it's worse for Harris, right? I mean, to me the Arnold and Creel inconsistencies are real, but Harris seems to me to be the real, sort of, he has the real howlers because he's got not only the sort of the three-phase answer that Judge Marcus has asked you about, you know, sort of what he knew about the shooting, where the shots were fired, where they hit the body, but also this bit about the gun being under the bed. Initially he says, well, you know, I just sort of brainstormed and thought about it and this was where Meadors told me he sometimes hid things and then at trial he says, no, no, no, Meadors' wife told me. I mean, Harris is just all over the place. Well, I don't think Harris, in his second statement when he actually went to the police station and made his official statement to the police he stated, I don't know where Harris, I don't know where Meadors would have said it, he was weird. Then he thought about it, right? Then he thought about it and then he called up the police two days later on the 16th and said, you know, Meadors told me that sometimes he hides things under the waterbed. Then at trial, he says. He said that the wife told him. Perhaps the wife did tell him prior to trial and he did not want to say that, but regardless, there's no way that Mr. Harris could have known about the $38 unless Meadors told him and if you look at Meadors' trial testimony, he specifically states nobody discussed anything. We didn't say a word from the time we left the Jiffy Mart until we got to the trailer park. So, there's no evidence there that they would have known how much money that was. So, that had to have come from Mr. Meadors to Mr. Harris and I don't disagree that you could have impeached Mr. Harris, but ultimately his testimony is the same that Meadors told him he shot somebody for $38. Is it a problem for you, I think I might have just realized this this morning in re-reviewing the remand court's decision, is it a problem for you at least for someone like me who thinks that Harris is all over the place that I don't think the remand court ever addresses any issue concerning Harris. They talk about the truck shooting reports and they talk about the Arnold Creel inconsistencies but I don't recall, and you can correct me if I'm wrong, that they ever address the Harris inconsistencies. I don't think they necessarily address the Harris inconsistencies, but I don't think that the court is required to discuss each and every piece of evidence that is put before them and I do believe that the police reports were given sort of en masse to the trial court and although Detective Boyette was questioned about some inconsistencies in there, I don't recall if he was questioned about the actual inconsistencies in Mr. Harris' statements. I could be wrong about that but the issue was not briefed to the remand court either. That's not to say that the remand court didn't consider everything that was put before them. Let me go back again to what defense counsel did and did not do. And again, it's not with an eye toward asking whether counsel was deficient or not. Speaking for myself, I think the answer is that he was at least in the main, although probably not with respect to the food stamp. In the main, with respect to the prior matters. But let me ask you, I want to go to prejudice. What impeachment did defense counsel actually mount against these three government witnesses, Harris, Arnold, and Creel? Just help me with the record. Mr. Davis put up four witnesses to testify regarding the events that happened from the time that Meaders was allegedly taken home around 8 or 9.30 by Arnold and Creel and then later picked up. Mr. Davis put up Wayne Martin who stated that Meaders came home and then he and Meaders went back to the Best Western and talked to Randy Harris. Meaders talked to Randy Harris and then he came back home and Meaders passed out on the couch and Mr. Martin left the house around 11 o'clock 10.30, 11 o'clock. He also put up Meaders' wife, Sherry Meaders who testified that to the same thing essentially. Right, so Sherry Meaders was called to testify in a manner that flatly contradicted the accounts of Arnold and Creel, at least in that respect. There was also the testimony of Meaders' brother-in-law and sister-in-law who testified that they saw Meaders, Arnold, and Creel shortly before the crime. If I understand, Stacey Meaders, Meaders' brother-in-law worked for the Best Western, I mean the Western Steer and he was making a bank deposit that night and he just made the deposit and Meaders and Arnold and Creel ran into him and Stacey Meaders and his wife both testified that they saw Arnold and Creel with a gun. What did he do with the witnesses on cross though as opposed to putting on conflicting witnesses in his case in chief? When he got up to cross-examine Creel, Harris, and Arnold, what if anything did he do? Well, unfortunately, he did not use their free trial statement. No, I understand that he didn't do that. I'm asking what he did do. He did question them about the events. He did question them, did you not see the gun beforehand? Did you not take Meaders back home and then later pick him up? You know, did these truck shootings happen? He did question them about all of those things and Arnold and Creel denied them. Let me ask you my last question. When it came to closing argument, what, if anything, did defense counsel say about the credibility of these principal government witnesses, Harris, Creel, and Arnold? Well, it was Arnold, Creel, and Harris all testified that after the crime, they did meet up, that Mr. Harris came and picked them up from the Shady Acres trailer park and they went back to their house and they talked and that was presented at trial and Mr. Davis relied upon that. He also pointed out certain things that were inconsistent about Mr. Arnold and Mr. Creel's testimony regarding the crime in that Mr. Arnold testified that he parked the car one place in front of the Jiffy Mart and Mr. Creel testified that he parked the car in another place. He generally attacked their credibility and their character saying that they got together and came up with this story because they were friends and related and things of that nature. I'm sure he said a lot more than that, but that's what I remember at this time. Thank you. Let me ask you this. If they were innocent of any role in the actual murder, why did Arnold and Creel lie about taking Medders home and then going back and getting him? I would imagine it's because they did not want to admit that they knew he had a gun because then that could place on them the theory that they knew he had a gun before he went into the store. Why does going back to get him show they knew he had a gun as opposed to never dropping him off? Because the testimony from Mr. Medders was that Mr. Arnold came back solely for the purpose of getting him and his gun. That was the whole purpose of them picking him back up was for the gun. And I do believe his wife testified to that as well. After having given a pre-trial statement that he never left the house. Correct. Yes, Judge Kearns. I think there were a couple of other issues I wanted to clear up regarding the record. Regarding the search of the waterbed, there is a police statement or a supplemental report that was part of the remand record that stated on October the 14th when they did the initial search of Medders' home, they did not look under the waterbed. That's what it states. And then the statement... Where does it state that? Who states that? Where? It is in a supplemental report. I believe it's by Detective... It's either Detective Denmark or Detective Boyette. The remand court order, I'm sorry, was not numbered and I did not write that down. I can find that for the court though. And it just plainly states in the supplemental report that they did not look under the waterbed. And that's in the record of the remand here? Yes, Judge Kearns. Then also, when they did go back and they looked under the waterbed... I know Detective... I do believe Detective Boyette. I can't remember if it was in a supplemental report or if he testified in the remand hearing that they had to lift up the waterbed a ways to get to it. It wasn't... You know, it was like a foot or two feet that they lifted it up to get to the actual murder weapon. Anna, you had a question also about how the court instructed on the notes. I think my brief is a little misleading. And it stated that the notes came out separately, but they all came out together. And the court instructed them all at the same time. I think this case really comes down to this. Would a fair-minded jurist have ultimately believed matter's version of the crime given the inconsistencies in impeachment that could have happened with Arnold, Creel, and Harris? And I think that's what the state court struggled with and the district court struggled with in doing the reasonable probability of a different outcome analysis. Because when you look at what matters at how the crime happened, it didn't make any sense. He claims that all three go in there. Mr. Creel goes to heat up his dandy sausage biscuit in the microwave. Then Arnold shoots Mr. Anderson. And then he tells Mr. Meadors to get the money out of the cash register. And the testimony from the manager of the store said that there was a $0.49 ring up, then $0.02 tax. And so the person would have had to have gone behind there, happened to have known what buttons to push. And this was part of Mr. Johnson's closing argument, or part of his questions of matters. So he would have known to put in whatever amount. He would have known how to hit the right tax button, because things are taxed at different rates. You've got groceries and tobacco and alcohol. And then hit the right button to get the sales, take the money out. Then Mr. Meadors states that they all just briskly walk out of the place. They drive in silence to the Shady Acres, and then Arnold and Creel get out. Arnold asks him if he wants the gun, and he says, no, you keep it. He just let a man murder somebody with his own weapon, and he told that gentleman to keep it. And then the person who did the crime asked for, wanted none of the money. It just doesn't make a lot of sense. But when you look at the testimony of Creel and Arnold and their pretrial statements regarding what happened during the crime, it does make sense. And they do tell the same story. And I think that is what the courts were looking at ultimately. Help me with something factual concerning the money itself. Because I understand the testimony from the store. Somewhere between $31 and $38 is missing from the register. Right? And they don't know the exact amount. When the defendant Meadors is arrested, he's found in possession of what we would call bait money, only in the sense that he had in his possession a bill that had been pre-marked so we know it came from the store. How much money was he arrested with in his possession? Did they find him with $31, $38, or just the particular $5 bill that happened to match up? And the $1 bill. It was, he actually had two wads of money in his billfold. And one was $16 and one was another higher amount. And I, sorry, I looked this up and now I've forgotten. I think it totaled somewhere near $60-something. Or it may not have been quite that much. And two of the bills had been pre-marked? Two of the bills found on him. The $1 bill and a $5 bill. Yes, they were the bait money that was found on him. And then a torn $1 bill, which was a bait dollar, was found in his home on top of the television. And the food stamp was found in his wallet? The food stamps were actually found in his field jacket. He had on a field jacket. When they came out to first speak to him, he came to the door and the officers were there and I think an agent from the GBI. And they asked him if he had any weapons any, you know, like a Green Army field jacket. He went to put his hand and the Lieutenant Bennett said stop. And they felt in his pocket, part of Terry's search, and he had a .22 pistol in there. And so they felt in the other pocket and there were food stamps in that. Going back to the store. The storekeeper marked all of the cash that was in there or only two bills or do we know? Only three bills were marked. One of one $5 bill, one $1 bill and another $1 bill. And two of the three were found in his wallet on arrest? Correct. Yes. He had been taken in for questioning at that time and his wallet I think had been put on the table and it was searched. What about the matter relating to the drugs? I'm talking about the document that purports to reflect some kind of charge for trafficking in cocaine. Yes, that was in Medder's wallet when it was confiscated. Does it reflect the court or does it reflect anything more particular than a torn item saying trafficking in cocaine? Yeah, the actual, it's a citation and the top part is torn and I can't remember if it reflects the court or if it was torn off or not. But that was all sent out en masse to the jury but there was no mention of that citation during the argument nor was it brought to the jury's attention at any time. Did the exhibits all go into the jury room? They did. Including the citation? They did. It states directly after the trial, a court charged the jury. He said okay we're going to send all the evidence out with the jury. So as far as we know, it went out. I can't say that it did not. Did Medder's testify at trial anything about food stamps? No, he did not. And regarding the food stamps, I'd like to point out that Arnold, Creel, and Harris all stated pre-trial that he had money and food stamps. Now at trial Creel and Arnold both stated again that he had food stamps after the robbery. Mr. Harris didn't specifically state food stamps. He said the stuff that was dumped out on his bed was a white piece of paper with writing on it. On the food stamps, if I have it right Boyd makes a note that's part of the police file regarding food stamps, quote, unable to trace food camps to store? Correct. Is that all that's reflected in the report itself? That's all that's reflected, Judge Marcus. I mean, there's no way to It's not as if they write it down. It's just like regular money. There was no testimony at trial that the food stamps were linked to the store, was there? I don't recall that testimony specifically. The testimony was that he had food stamps after the robbery, but they did not put up anybody. The state did not put up anyone to say these food stamps came directly from the store. And Margaret Clements, the manager, testified. I have no way to know what food stamps there were or not. Unless the court has any further questions, I would just ask that the court affirm the decision of the district court and deny relief to Mr. Matters. I don't believe we have any more. Thank you. Mr. Walensky, five minutes. Thank you, Your Honor. First, the site I promised you about the police report where Mrs. Matters told Bert Medlin, I think, or Denmark, rather, that she was a legal recipient. It's document 12-88 at 19-20 and that's in Exhibit D as in David 1 to the remand hearing. One of those food stamps was found in the house. The other 20 or so were on his person. There were a number on his person. It was more than a couple. But the wife wasn't asked at trial, are you a legal recipient? A couple of quick points responding to issues that came up during the state's argument. Harris actually provided three critical points of testimony. He had the confession that we've talked about, he had the waterbed that we talked about, and we've only barely alluded to the motive. Harris is the only one who provided the motive and that ties into that cocaine citation. My recollection of having seen the actual citation is that the top isn't torn up, it just got folded over and so when it's xeroxed you can't really see the top, but it's a formal court citation for cocaine. Was anything said during the trial about Harris being on probation? No. Was marijuana sale possession? Not only that, he'd been violated, gotten back out on probation, so he was on a higher level of scrutiny, didn't come out. But the underlying charge was marijuana possession, trafficking, because it was pounds. Harris though, help me with Harris. Harris testifies, if I have this right, that the day before the robbery the defendant purportedly told him that the defendant owed a drug dealer $2,000. That was his testimony at the trial. Yes. In the earlier iterations of his accounts we know there were two. One in the middle of the night where he denies owing anything, and then there's a second one where he says the defendant came to me and told me he shot him and got made off with $38. Does he say anything about the statement by Meders the day before the robbery that Meders owed a drug dealer $2,000? I am pretty sure he did not. I don't think there's a mention of the $2,000 threats by drug dealer. I don't think that's in his statement that was recorded. It's like a 15-page statement that's transcribed. So, number one, Harris had those three parts. I think it's worse than I think it was Judge Newsom mentioned when you asked about whether Harris, whether Judge Tutin analyzed the changes in the Harris situation. He didn't, number one. But number two, he relied on the prejudice as overwhelming based on Harris' testimony as if Harris had been unimpeached. So he cites the confession testimony and he cites the waterbed finding of the gun without any indication that he analyzed any of the impeachment that related to Harris, which is particularly curious in this case because he did analyze the impeachment as it related to Creel and Arnold. So he completely missed that Harris had his credibility challenged. Johnson did harp on the food stamps in his closing. At one point, Johnson in his closing said that, kind of sarcastically, Medders forgot that he had those food stamps in his pocket. He brought it up opening, and I think it was the opening as well, but certainly in the closing brings that back home, food stamps in the pocket, on top of the lie about the truth, same story since day one. Now why is the, he had food stamps in his pocket and he forgot about them. Why is that a lie? No, that part's not a lie. I'm just saying that Johnson harped on that point. Because he had every right to do. I mean, that's a piece of evidence that wasn't. Actually, I disagree. He had a note that said we can't tie these food stamps to this robbery. Yeah, but if somebody goes to a bank and robs a bank and he gets $20 bills and they arrest him and he's got eight $20 bills in his wallet, that's a legitimate, I guess he forgot about those $20 bills. I mean, that's not unethical. He didn't say he had these food stamps and they're traced to the store. Certainly, go ahead. I think, Your Honor, that the issue with the food stamps, knowing, as we all do now, that they couldn't be traced, is really just another failure of the jury. I mean, if Sarah Meadows had it on him, you can mention it like the $20 bills, as Your Honor says, but somebody should have told the jury, legal recipient, he had a right to have those food stamps on his person. Assuming Sarah Meadows' statement was true. Well, then you have Not all of them were. Not all of anybody's is true, best I can tell. Well, you do have Jack Boyette's note. My time is up. I thank you for the extra time. Thank you. Mr. Bielanski, we note your CJA appointed attorney for appellant. We appreciate that very much and you did an excellent job in your brief here today and thank you for undertaking that. And co-counsel as well. We'll take that case under submission. Thank you.